## Knast Estate

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

The facts appear from the following extract of the adjudication of:

BOLGER, J., Auditing Judge.—This decedent died on September 7, 1947, intestate and unmarried, leaving as the persons entitled to his estate under the intestate laws two children, Veronica Knast Stratton and Harry J. Knast, both of whom are living and of age. . . .

Mary Kaufman, a sister of decedent, contracted for and paid the funeral bill amounting to $494, and she now seeks reimbursement from the estate. The accountant, who is also a sister of decedent, denies that the estate is liable, and contends that the claim should be dismissed on the ground that claimant was beneficiary of and received certain proceeds of insurance on the life of decedent in consideration of her promise to pay funeral expenses. The amount of the bill is not in controversy; the fact that claimant actually paid it is not denied, and it is conceded that the funeral was

properly conducted and the services charged for were rendered.

Decedent made his home with his sister, claimant, "off and on" for about 15 years before his death, but ceased to live with her "about eight months to a year" before he died. After his death, claimant notified his daughter, who lived in Trenton, and the other sister, but there was no discussion among them of funeral arrangements. Decedent's son was "supposed to be in California" and, of course, he was not consulted. Claimant went ahead and made all arrangements for the funeral without consulting the next of kin, because, as she said, "I did not think I had to 'consult them' because he made his home with me more than he did with the others." She said that she had made arrangements for the funeral because she did not think he "had any money, he only worked off and on". Claimant testified that decedent never paid her any board during the time he lived in her home; that he was employed only about "half the time", and that she "helped him out all she could".

As to the life insurance, claimant testified that she took out the insurance about 10 years ago "Because he never worked steady and I wanted to put him in a good resting place"; and "I wanted to pay his expenses, I did not want to bury him in Potter's Field." She said the insurance proceeds amounted to "about $1,500", but counsel intimated that she received in excess of $2,000, and admittedly there were two policies cancelled and proceeds received by her prior to decedent's death. Claimant testified that she took out the insurance on decedent's life so she would have money with which to bury him, but she added: ". . . being as I found out he had a little estate I felt he ought to pay his own funeral expenses." Administratrix, who contests the claim, testified that decedent "had some insurance he carried on himself before he

took sick . . . then he wanted to cash them in but she (the claimant) would not let him, she said she would carry the balance on and see that he got a decent burial; that was the arrangement for the funeral." Also, administratrix said that claimant told her on numerous occasions that "she would bury my brother when he died."

From the foregoing, and by her own admission, I gather that claimant either took out or took over certain insurance on the life of decedent, in which she was named as beneficiary, and paid the premiums for some length of time. She did this for the express and sole purpose of creating a fund out of which decedent's funeral expenses might be paid, and, in effect, she had an agreement or at least a tacit understanding with decedent that the proceeds of the insurance would be applied first for that purpose. As further evidence of this, after decedent's death, without consulting any of the next of kin, she made all arrangements for the funeral and paid the undertaker's bill out of the insurance money. It was not until after she learned that decedent "had a little estate" that she came to the conclusion "he ought to pay his own funeral expenses". Now without making any offer to pay any part of the insurance proceeds over to the next of kin, she would abrogate her agreement by having them bear the burden of funeral expenses. The evidence discloses that she made a bargain which resulted in quite a substantial profit to her and, after having faithfully fulfilled her promise and pocketed the profit, she now seeks to repudiate her agreement and receive further benefit at the expense of the next of kin. To allow her claim under these circumstances would be to permit her to have both the "penny and the cake", and therefore justice and equity dictate that her claim be dismissed.

I am aware of the cases which hold that in the absence of an executor or administrator, a stranger

or relative may attend to funeral arrangements, and if he pays therefor he is entitled to be reimbursed out of the estate; the law implies a request and promise to pay: Hunter's Pennsylvania Orphans' Court Commonplace Book, vol. 1, p. 545, and, particularly, Sinnott's Estate, 15 Dist. R. 873. Nevertheless, where, as here, there is an insurance fund which is earmarked for payment of funeral expenses, there can be no implied obligation on the part of the estate to pay. The person who receives the insurance fund, orders the funeral, pays for it, and then retains the excess proceeds, certainly cannot seek and receive reimbursement from the estate. The claim is dismissed. . . .

*M. Robert Beckman,* for exceptants.
*Charles D. Smeltzer,* contra.

SINKLER, J., January 7, 1949.—Exceptions to the adjudication have been filed by Mary Kaufman, a sister of decedent, because of the dismissal of her claim to be reimbursed for the amount of the funeral bill which she paid out of money received from insurance upon the life of decedent. By the terms of the policies, the moneys were payable to her, and she paid the premiums for some years preceding his death. Another sister testified, in effect, that claimant had stated many times that she would pay the expenses of decedent's funeral out of the proceeds of the policies. Claimant testified that she maintained the insurance in order that she would have money to bury him, "but being as I found out he had a little estate I felt he ought to pay his own funeral expenses."

We are agreed that the decision of the auditing judge is correct and do not find it necessary to rewrite his adjudication or elaborate upon it.

Exceptions have also been filed by Virginia Boyzniuk, guardian of the estate of Benjamin Mauro, Jr., a minor, greatnephew of decedent, based on the

deposit of money in a saving fund account by decedent in his name "in trust for Benjamin Mauro, Jr." It appears that decedent delivered the deposit book to the mother of the minor and said, "Now the child has money." She retained possession of the book until the death of decedent. Decedent had also a saving fund account with the same bank in his own name. His administratrix has collected and accounted for the amounts of both deposits. The guardian claims the amount of deposit in the name of decedent in trust for the minor. The auditing judge dismissed her claim.

The brief of argument filed in behalf of exceptant cites Gaffney's Estate, 146 Pa. 49 (1892), an appeal from the Orphans' Court of Cambria County. It is held that the orphans' court had jurisdiction to award to the beneficiary of a trust the amount deposited in a bank to the credit of decedent in trust for the beneficiary. This case is cited because "the auditing judge suggested in the record that the claimant's remedy was against the bank."

In the adjudication in this matter, Walsh's Appeal, 122 Pa. 177, is cited. Decedent was a depositor in the Philadelphia Saving Fund Society. During her last illness she handed her bank book to Thomas Doyle, saying: "The money there is for my sister in Ireland, but if I don't die I want it back." The opinion of this court, by Penrose, J., concludes that the gift was valid despite "the regulation of the saving fund with regard to the steps required to perfect the legal title of transferees".

Reference is also made in the adjudication to Hunter's Pennsylvania Commonplace Book, vol. 1, p. 564, and cases there cited: "A bank book is not legal evidence of the deposit, but is merely a statement of account, and manual delivery of the book, without assignment in writing, will not operate to transfer title to the donee."

It appears that decedent, in June 1943, deposited $150 in the Kensington National Bank and received a savings fund deposit book. The account was opened in the name of decedent in trust for Benjamin Mauro, Jr., a grandnephew, and then a baby. The auditing judge holds that the trust was revocable and was revoked in 1946 in the following manner: It appears that the Kensington National Bank was taken over by the Pennsylvania Company and a change was made in the bookkeeping methods. Depositors were notified to exchange their books for new ones. Decedent went to the bank and got a new book, but the mother of the minor retained possession of the original. The record of the bank, which was offered in evidence, shows the caption: "Harry L. Knast in trust Benjamin Mauro". A line was drawn through the name of the minor on the card. The auditing judge evidently was of the opinion that the trust was revocable and was revoked. With this we do not agree. Reference is made to 1 Scott on Trusts, 354, par. 58.1. Intention to create an irrevocable trust may be shown by the words and conduct at the time the deposit was made or later. Where the depositor delivers the bank book to the beneficiary, this is an indication of his intention to make the trust irrevocable, but it may be shown that the book was delivered to the beneficiary only for safekeeping.

In the present case, the original bank book was shown to the mother of the minor, a niece of decedent. Her testimony is as follows:

"By Mr. Buckman: . . .

"Q. I show you a bank book and ask you how did you get this book, which is Account No. 48025 in the Kensington National Bank of Philadelphia?

"A. From my uncle, Harry L. Knast.

"Q. Tell his honor how you came to get that book.

"A. I was sitting in the house one day and he came in and asked me if my son had any money. I said:

'No, he hasn't.' He said, 'He has now.' I said, 'What do you mean?' And he takes the book and hands it to me across the table and said: 'He has $150 now.' So I said, 'All right'. And I thanked him; that was all.

"Q. When did he give you this book?

"A. In the summer.

"Q. Of what year?

"A. '43."

In the volume above cited, the writer continues, where the depositor informs the beneficiary of the deposit he may thereby indicate an intention to make the trust irrevocable.

In the present case the delivery of the deposit book by decedent to the mother of the minor, a baby, and the language used by him at the time indicate an unmistakable intention to create an irrevocable trust. There exist the elements which constitute an irrevocable trust: opening the account in the name of the depositor in trust for the beneficiary; delivery of the deposit book to his natural guardian; and the words uttered at the time of delivery. Accord: McGary Estate, 355 Pa. 232; Downey v. Duquesne City Bank, 146 Pa. Superior Ct. 289.

Inquiry was made of the bank whether additional deposits were made in this account, and the answer was in the negative. A letter has been received, addressed by the attorney for the guardian to the attorney for the accountant, to the effect that the claim is for $150, plus $4.53 interest, or $154.53. The claim is allowed in that amount.

The exceptions filed on behalf of Mary Kaufman are dismissed; the exceptions filed on behalf of Virginia Boyzniuk, guardian of the estate of Benjamin Mauro, Jr., a minor, are sustained in part, and the adjudication, as above modified, is confirmed absolutely.